IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION



FILED BY _____ D.C.

DEC 2 7 2017

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

MARCOS PADRON, on behalf of
The UNITED STATES OF AMERICA, and
MARCOS PADRON, individually,

        Plaintiffs,

vs.

US MED, LLC and UNITED STATES
MEDICAL SUPPLY, LLC,

        Defendants.

_____/

Case No.: **17-cv-24687 Ungaro**
**FILED UNDER SEAL**
Jury Trial Demanded

## QUI TAM COMPLAINT

Plaintiffs United States of America (the "Government"), by and through Relator Marcos

Padron, and Marcos Padron ("Padron"), individually, sue Defendants US Med, LLC ("US Med")

and United States Medical Supply, LLC ("USMS") and state:

### Parties, Jurisdiction, and Venue

1.    Padron is a citizen of the USA.  He is a resident of Miami, Florida.

2.    Padron brings this action as a relator for the benefit of the Government pursuant to

the False Claims Act, with the applicable statutory sections located in 31 USC §§3729 – 3232.

3.    Padron also brings this action individually due to a retaliatory and adverse

employment action in accordance with 31 USC §3730(h), as well as this Court's supplemental and

pendent jurisdiction pursuant to 28 USC §1367 since Padron's Florida state law whistleblower

claim (Count IV) is so closely related to the other claims set forth herein.

4.    US Med maintains its principal address in Miami, Florida.  Its manager, Stephen

Foreman, is a resident of Florida.

1

5.      USMS maintains its principal address in Miami, Florida.  Its managers, Patricio

Casillas and Stephen Foreman, are residents of Florida.

6.      Venue is appropriate in the Southern District of Florida, Miami Division, as this is

where US Med and USMS are located and transact business and where the retaliatory and adverse

employment conduct described herein occurred.

## General Allegations

### A.  US Med Background

7.      US Med operates a mail order pharmacy and is a supplier of durable medical

equipment ("DME").

8.      US Med is an authorized, accredited supplier of DME pursuant to Medicare's

Durable Medical Equipment, Prosthetics, Orthotics and Supplies ("DMEPOS") Competitive

Bidding Program.

9.      Medicare, Part B Coverage, covers medically, reasonably necessary DME

prescribed by a physician such as blood sugar testing strips (a/k/a diabetic testing strips) and

inhalation drugs used in nebulizers (*e.g.*, Albuterol Sulfate, Ipratropium Bromide, and

Albuterol/Ipratropium ("Inhalation Drugs).

10.     Medicare is a federal program administered by the Centers for Medicare &

Medicaid Services ("CMS"), which is a federal agency within the United States Department of

Health and Human Services.

11.     Thus, US Med is an authorized and accredited Medicare, Part B supplier of DME

(including Inhalation Drugs and supplies).  US Med dispenses Inhalation Drugs and diabetic

testing strips in virtually every state within the United States.

12.     US Med is also a licensed pharmacy in Florida (and many other jurisdictions as a nonresident pharmacy that the drugs it dispenses are mailed too).   In Florida, US Med's pharmacy license is PH23521.  Its current, licensed pharmacist is Adrienne Michelle Horn (license #52589 with an effective date of 7/24/17) and its supervising practitioners include Stephen Foreman (effective date 2/22/17), John Harroff (effective date 7/31/15), and Camilio Horvilleur (effective date 7/31/15), as pharmacy affiliates.

13.     Prior to Adrienne Michelle Horn serving as the licensed pharmacist for US Med's pharmacy, the pharmacist was Fernando L. Garcia (License #PS34075).

**B.  USMS Background**

14.     USMS is a related sister entity to US Med.

15.     USMS is also an authorized and accredited Part B Medicare supplier of DME.

16.     USMS is also authorized and accredited with Florida's Agency of Health Care Administration (AHCA) as a provider of home medical equipment (license #1313231).  AHCA is responsible for the implementation of Medicaid in Florida. (US Med is not believed to be authorized and accredited with AHCA as a provider of DME).

17.     USMS is not a licensed pharmacy in Florida.

**C.  Padron's Discovery, Investigation, and Reporting**

18.     On April 30, 2015, Padron was hired as the Director of Pharmacy of US Med.  He was hired in a nonclinical role to handle the call center operations and warehouse and shipping operations (business ooperations).   Padron was hired by US Med's founder and former CEO Zachary Schiffman. (**Exhibit "A"**, Declaration of Padron, ¶2).

19.     After Padron was hired, H.I.G. Capital, LLC, a private equity investment firm, recapitalized and procured ownership in US Med.  In doing so, in or around late 2016, US Med

hired Stephen Foreman as the new CEO, Mary Ellen Conway as the Chief Compliance Officer, Thomas Barron as the Chief Sales Officer, and Patricio Casillas as the VP of Business Strategy. (**Exhibit "A"**, ¶3)

20.     Patricio Casillas became Padron's direct supervisor at US Med. (**Exhibit "A"**, ¶3)

21.     Patricio Casillas also became a direct supervisor of Kimberly Broom, the Director of DME Operations.  Kimberly Broom's department handles US Med's and USMS's DME Medicare billing to CMS.  She is also married to US Med's Chief Financial Officer Clydall Bob. Both Kimberly Broom and Clydall Bob were employed at US Med prior to H.I.G. Capital, LLC's recapitalization of US Med. (**Exhibit "A"**, ¶4).

22.     In or around July 2017, the pharmacist Fernando L. Garcia resigned and Adrienne Michelle Horn was hired to replace him as US Med's licensed pharmacist (and Sr. Clinical Pharmacist in charge of all Clinical Decisions). (**Exhibit "A"**, ¶5).

23.     Adrienne Michelle Horn notified Padron that something appeared wrong with the manner in which US Med had been dispensing Inhalation Drugs in the past.  In looking closer and investigating this concern, Padron learned that Fernando L. Garcia, as the pharmacist, had been changing the frequency of patients prescribed Inhalation Drug orders, thereby altering the quantity of an Inhalation Drug dispensed to a patient.  For example, if a physician's prescription for an Inhalation Drug called for a frequency of four daily treatments, US Med was only dispensing three daily treatments.  This altered the prescribing physician's prescription (without any identifiable consent from the physician) and short-changed the prescribed quantity of the Inhalation Drug given to a patient.  Moreover, Padron learned that US Med's Medicare billing department to CMS was not revising billings to Medicare, meaning that CMS was being billed for the full value of the prescription (four daily treatments of the Inhalation Drug) when, in reality, only three daily

treatments were being dispensed to the patient.  This naturally had the effect of an over-billing to CMS for Medicare funds that went back potentially a number of years relating to the manner in which US Med had been dispensing and billing CMS for Medicare funds relating to Inhalation Drugs. (**Exhibit "A"**, ¶6).

24.      Alarmingly, however, Padron learned much more.  Padron learned that Fernando L. Garcia had <u>not</u> been performing drug utilization reviews (DUR) prior to dispensing the Inhalation Drugs.[1]  No reasonable or apparent effort had been made or input into US's Med's Abacus database [2] regarding patient medical history including medical conditions, chronic conditions, allergies, or other drugs a patient was currently taking that could interfere with the prescribed Inhalation Drug.  This lack of DUR was extremely upsetting to Padron because without a DUR, US Med could have been dispensing drugs where a patient could be allergic to the drug, could have a drug-to-drug interaction, or may have a drug-to-existing-medical-condition interaction.  Further, not performing any DUR or having any medical records or progress notes from a physician prior to dispensing the Inhalation Drugs meant that US Med could be dispensing drugs without ensuring the drugs were medically and reasonably necessary to the patient, as CMS requires for Medicare funds. (**Exhibit "A"**, ¶7)

25.      Padron also learned that Fernando L. Garcia, as the pharmacist, had been dispensing Inhalation Drugs without any patient counseling being offered to the patient.[3]  There was no verbal or written offer to counsel a patient regarding the prescribed Inhalation Drug or any record in the

---

[1] By way of example, Florida Administrative Code Rule 64B16-27.800 requires a pharmacy to collect and maintain patient records and Rule 64B16-27.810 requires a pharmacist to conduct prospective drug use reviews.   (This is also required as set forth in other aspects in Section 64B16 of Florida's Administrative Code.)

[2] US Med previously used Abacus pharmacy software as its database from opening through on or about July 2017. After, US Med stopped using Abacus and is now using Caliber 1 by HBSRx pharmacy software as its database.

[3] By way of example, Florida Administrative Code Rule 64B16-27.820 requires patient counseling.

Abacus pharmacy database of the patient foregoing the offered counseling and US Med's database did not document any such efforts, whether to the patient or the patient's caregiver, as the case may be. (**Exhibit "A", ¶8**)

26.     Padron also learned that USMS, which is <u>not</u> a licensed pharmacy, was using US Med's pharmacy to dispense the drugs that USMS bills for directly.  Padron's direct supervisor is a manager of USMS.  USMS has contracts to prescribe drugs to Medicare-approved private health insurance providers through Medicare's Part C Coverage.  These plans are also referred to as Medicare Advantage Plans.  Padron learned that USMS is billing the Medicare Advantage Plans for Inhalation Drugs when the Inhalation Drugs were not being dispensed by USMS, but by US Med (since USMS is not a licensed pharmacy). (**Exhibit "A", ¶9**)

27.     Padron determined that moving forward no Inhalation Drug prescriptions would be unilaterally altered, and no drugs would be dispensed without obtaining a patient's medical records and conducting a DUR and offering patient counseling.  (**Exhibit "A", ¶10**)

28.     Padron then met with the Pharmacy Supervisor at the time, Cheryl Foye, to inquire about Fernando L. Garcia's changing of Inhalation Drug treatments to patients.  Padron learned in this conversation that the pharmacist apparently had an unwritten rule not to dispense any Inhalation Drug treatments that called for a frequency of four times per day and would short-change such patients by one treatment per day (by only dispensing Inhalation Drugs that would satisfy a frequency of three times per day).  Padron also learned that this was done without obtaining the prescribing physician's consent.  Padron further learned that due to the volume of work required, the pharmacy did not have the resources to call patients or their physicians to get medical records, conduct a DUR, and no patient counseling was being offered.   Padron further learned that no efforts were being made to advise US Med's DME Medicare billing department of

these salient facts, which would include an over-billing to CMS for Medicare funds where CMS was being billed for four daily prescribed treatments but, in actuality, only three daily prescribed treatments were being dispensed. (**Exhibit "A", ¶**11)

29.     Padron immediately went to his supervisor, Patricio Casillas, to report to him what he learned and that he firmly believed these discovered practices or issues to be irregular, unethical, and fraudulent / illegal.  Padron reported to his supervisor that he would not ship out any Inhalation Drugs (or any drugs, for that matter) without corrections moving forward regarding obtaining patient records, conducting DURs, and offering patient counseling.  Padron asked Patricio Casillas whether he wanted to discuss the issue of the previous improper billings to CMS with Kimberly Broom (Director of DME Operations) and Patricio Casillas advised Padron to speak with her directly.  (**Exhibit "A", ¶**12)

30.     Padron met with Kimberly Broom to report to her of the practices regarding the improper Medicare billings, that he did not know how far back this issue went, and that this billing issue needs to be reported to CMS and rectified with overbillings returned.  Padron also notified Kimberly Broom regarding the lack of DURs and patient counseling under Fernando L. Garcia's pharmacy regime, which posed a health safety risk to patients and whether medically and reasonably necessary drugs were being dispensed.  (**Exhibit "A", ¶**13)

31.     A few days later, Padron had a follow-up conversation with Patricio Casillas regarding his conversation with Kimberly Broom.  Patricio Casillas expressed serious concern with Padron's impact to stop dispensing Inhalation Drugs without performing a DUR or offering patient counseling since that decision has a financial impact on US Med and USMS.  For instance, if medical records had to be obtained for patients awaiting an order so that a DUR could be

performed, this would result in a billing slow-down and immediate cash flow impact. (**Exhibit "A", ¶**14)

32.     Padron and Patricio Casillas then had a discussion with Clydall Bob (Chief Financial Officer) where Padron again reported the issues and practices. Again, it was discussed that Padron's decision to remedy the situation moving forward under his control posed an immediate cash flow concern due to the billing slow-down. Padron then stated that upon learning of the practices he believed were irregular, unethical and fraudulent / illegal, he was not going to continue with the same practices, particularly those that can harm a patient or violate licensing requirements, without doing what he could to correct the issues he could correct moving forward. (**Exhibit "A", ¶**15)

33.     A few days later, Padron reported the issues and practices directly to Mary Ellen Conway (Chief Compliance Officer) and relayed the aforementioned conversations he has had with others at US Med so that the issues could be addressed and self-reported to regulatory agencies. (**Exhibit "A", ¶**16)

34.     A few days later, Padron then spoke directly with the CEO Stephen Foreman. (Padron had previously been advised by his supervisor, Patricio Casillas, that Stephen Foreman had been notified of the issues and practices Padron had reported.) In addition to Padron reporting these issues and practices to Stephen Foreman, he directly advised him that US Med should not be dispensing Inhalation Drugs that USMS is billing when USMS does not have a valid pharmacy license and US Med does not have the contract to dispense those drugs under Medicare's Advantage Plans under Medicare's Part C Coverage. Padron advised of his uncomfortability continuing to do so since his understanding of Medicare billings requires that the DME supplier has to have a licensed pharmacy and that the billing provider (USMS) has to dispense the drugs.

Stephen Foreman, despite Padron's disagreement, responded that since USMS and US Med have the same ownership, it is acceptable for US Med to dispense drugs that USMS is billing for (even though USMS is not a licensed pharmacy).   Stephen Foreman further notified Padron that the past occurrences would be internally investigated and taken care of. (**Exhibit "A", ¶17**)

### D. Retaliation Against Padron

35.     From in or around July / August of 2017 through the end of November 2017, and notwithstanding Padron's personal follow-ups, Padron was not advised of any self-reporting to any regulatory agency of any of the issues he internally reported.  This includes self-reporting any of the overbillings to CMS.  To this point, Padron was not even advised of any ongoing internal investigation into these issues.  (**Exhibit "A", ¶18**)

36.     Meanwhile, the discovery of irregular, unethical, and fraudulent / illegal practices created a very tense, uneasy, and stressful environment, specifically for Padron.   He had independently orally reported the issues and practices to his supervisor and others within US Med. He had worked to correct those practices within his control moving forward, despite backlash regarding the immediate financial cash flow impact correcting issues moving forward would create.  He was deeply concerned about the well-being of patients that were dispensed drugs by US Med's pharmacy without any DUR or patient counseling and with no understanding as to how US Med and USMS was going to report or remediate past occurrences of this issue.  He was nervous that US Med had been improperly billing and over-billing Medicare with no understanding how US Med was going to report or remediate this past occurrence.  He was stressed as to potential pharmacy licensure violations, not only in Florida but in other jurisdictions where US Med operates as a nonresident pharmacy.  And, US Med's CEO, Stephen Foreman, CFO Clydall Bob, and supervisor Patricio Casillas were putting added pressure on Padron requiring the pharmacy to

improve its financial numbers and that the numbers in September and October were unacceptable, further insinuating that Padron's job would be in jeopardy if the numbers did not drastically improve (and that Padron was a driving force behind lower numbers due to the corrective measures he was implementing).[4]  **(Exhibit "A", ¶19)**

37.     On the evening of November 28, 2017, Padron was advised by the Pharmacy Operations Manager, Arlene Orenstein, that the pharmacy was out of One Touch Diabetic Strips. Due to issues and practices that he had reported and were being uncovered, and the fact that cash-flow impacts were being directed to Padron, he became concerned why he was finding out about this issue after working hours.   There is a fairly set schedule for US Med's ordering of inventory so not having inventory raises questions, particularly when the pharmacist has discretion to order additional inventory as-needed.  The next morning around 8am, Padron called the pharmacist, Adriene Michelle Horn (who was on her way to jury duty), inquiring why he learned the night before that the pharmacy was out of One Touch Diabetic Strips.  She advised Padron that there was sufficient inventory, raising a very dubious and troubling disconnect between what he had been advised approximately fifteen hours earlier by the Pharmacy Operations Manager.   During the call and as Padron was trying to reconcile the obvious disconnect, the pharmacist hung up the phone.   That afternoon Padron was abruptly placed on paid suspension and he was never advised what the disconnect was regarding inventory levels between the personnel within the pharmacy that deal with the inventory.  On December 18, 2017, Padron's paid suspension came to an end and his employment was terminated.   **(Exhibit "A",** 20)

38.     All conditions precedent to brining this action have occurred, have been performed, or have otherwise been waived.

---

[4] Padron had previously advised US Med personnel that his wife had a serious, ongoing medical condition.  Padron needed his employment.

39.     Padron has retained the undersigned counsel and is responsible for paying reasonable attorney's fees to prosecute these claims.

<b>Count I – Qui Tam Action Against US Med<br>(Action under 31 U.S.C. §3730(b) by the Government)</b>

40.     The allegations in paragraphs 1-39 are incorporated herein.

41.     US Med, from in or around July / August of 2017 and earlier, was over-billing CMS for Medicare funds as the direct result of (i) its pharmacist knowingly altering and short-changing prescriptions for Inhalation Drug treatments without the consent of the prescribing physician, and without performing any DUR or offering any patient counseling and (ii) its DME Operations / billing department knowingly billing or causing to be presented false bills to CMS for Medicare based on the physician's prescription and not the reduced quantity being dispensed, as well as knowingly billing or causing to be presented bills without the documentation to support the medical and reasonable necessity of the dispensed prescription.

42.     US Med was paid by CMS for Medicare funds based on the false bills and not based on the actual quantity of Inhalation Drug treatments dispensed by US Med's pharmacy (and without any reasonable effort relating to the reasonable and medical necessity of the treatment).

43.     US Med, pursuant to 31 USC §3729, is liable to the Government for a civil penalty plus three times the amount of damages which the United States sustains because of the actions of US Med.

44.     US Med, pursuant to 31 USC §§3729 and 3730, is liable for the Government's (and Padron's) reasonable attorney's fees and costs.

Wherefore, the Government seeks all relief available to it in accordance with the False Claims Act including civil penalties, three times the amount of damages which the Government sustains, interest, attorney's fees, and all other relief this Court deems just and proper.

11

<u>**Count II – Qui Tam Action Against USMS**</u>
<u>**(Action under 31 U.S.C. §3730(b) by the Government)**</u>

45. The allegations in paragraphs 1-39 are incorporated herein.

46. USMS knowingly submitted and caused to be presented bills to CMS funded by Medicare through Part C Medicare Coverage where US Med, not USMS, dispensed the prescription Inhalation Drugs.  USMS could not dispense the prescriptions in that it is not a licensed pharmacy yet the dispensed prescriptions were billed for by USMS.[5]  US Med, pursuant to 31 USC §3729, is liable to the Government for a civil penalty plus three times the amount of damages which the Government sustains because of the actions of US Med.[6]

47. USMS was paid by Part C Medicare Advantaged Plans for Inhalation Drugs subsidized by CMS when the drugs were dispensed by US Med, not USMS.

48. USMS, pursuant to 31 USC §3729, is liable to the Government for a civil penalty plus three times the amount of damages which the Government sustains because of the actions of USMS.

49. USMS, pursuant to 31 USC §§3729 and 3730, is liable for the Government's (and Padron's as a relator) reasonable attorney's fees and costs.

Wherefore, the Government seeks all relief available to it in accordance with the False Claims Act including civil penalties, three times the amount of damages which the Government sustains, interest, attorney's fees, and all other relief this Court deems just and proper.

<u>**Count III – Retaliatory Qui Tam Action Against US Med**</u>
<u>**(Action under 31 USC §3730(h) by Padron)**</u>

---

[5] 42 CFR 424.57(b)(4) provides:

> A supplier that furnishes a drug used as a Medicare-covered supply with durable medical equipment or prosthetic devices must be licensed by the State to dispense drugs (A Supplier of drugs must bill and receive payment for the drug in its own name. A physician, who is enrolled as a DMEPOS supplier, may dispense, and bill for, drugs under this standard if authorized by the State as part of the physician's license.

[6] USMS is licensed with AHCA to furnish DME, presumably for purposes of Medicaid reimbursement.  Padron has no knowledge regarding Medicaid billings and does not know whether US MED's lack of DUR or patient counseling--requirements for pharmacies participating in the Medicaid program--extend to Inhalation Drugs reimbursed through Medicaid.

50. The allegations in paragraphs 1-39 are incorporated herein.

51. Padron was suspended and then discharged due, wholly or partially, to his investigation, direct reporting to supervisors and others at US Med, and otherwise affirmative action to stop what he believed were irregular, unethical, and illegal / fraudulent practices moving forward including actions that had the potential effect in defrauding the Government.

52.  Padron was retaliated against, through threats or otherwise that implicated his job, when he orally notified his supervisors and others of changes he was implementing moving forward (and following-up on the company's corrective actions of past occurrences) and being told his decisions were impacting the finances and cash flow of US Med & USMS.  This was compounded when US Med's CEO complained about the pharmacy's September and October numbers insinuating Padron's job was in jeopardy if the numbers did not improve; obviously, numbers cannot improve if there is no inventory to dispense.

53. Padron was further retaliated against when he was abruptly suspended when he was trying to reconcile an inventory-related issue with diabetic testing strips, especially in light of all of the other issues and practices he uncovered, directly reported, followed-up on, all of which forced to work in a very unsettling environment.

54. Padron's actions and direct reporting to US Med's supervisors constitute protected activity, particularly his reporting of billing practices to the Government (CMS) he believed to be fraudulent.

55. As soon as Padron was placed on suspension, he sent a letter, through counsel, on December 3, 2017 regarding some of the practices he had orally reported to US's Med's supervisors.  A copy of this letter is attached as **Exhibit "B".**  Notwithstanding, Padron was ultimately discharged on December 18, 2017.  (**Exhibit "A"**, ¶22)

13

56. Padron, pursuant to 31 USC §3730(h)(2) seeks reinstatement, two times the amount of back pay, interest on the back pay, and special compensatory damages as a result of the discrimination / retaliatory conduct such as emotional distress, litigation costs and reasonable attorneys' fees.

Wherefore, Padron seeks all damages and relief available to him under 31 USC §3730(h) including reinstatement, two times the amount of back pay, and special compensatory damages as a result of the discrimination / retaliatory conduct such as emotional distress, litigation costs and reasonable attorney's fees.

### Count IV – Florida Whistleblower Action Against US Med
### (Action under Florida Statute §448.102 by Padron)

57. The allegations in paragraphs 1-39 are incorporated herein.

58. This is an action by Padron under Florida state law, specifically Florida Statute §448.102. Padron asserts this action pursuant to this Court's supplemental and pendent jurisdiction.

59. Padron, upon his investigation and discovery of practices he believed to be unethical, irregular, and/or fraudulent / illegal, objected to and refused to participate in such practices which he believed to be in violation of laws, rules, and regulations (including regulations governing US Med's pharmacy license in Florida and numerous states it is licensed in as a nonresident pharmacy).

60. In addition to the above, Padron objected to the manner in which US Med was operating under rules and regulations associated with pharmacy benefit managers ("PBM").  Particularly, Padron raised objections to any ongoing participation or involvement in: (i) US Med dispensing mail order diabetic testing strips under PBM contracts when the contracts are retail contracts and Padron believed this was a violation of the contract; and (ii) US Med, upon losing a certain PBM

contract, would purchase a retail pharmacy (that it would internally call a burner pharmacy[7]) without disclosing to the PBMs the true, new ownership of that pharmacy.  (**Exhibit "A"**, ¶21).

61. Padron was retaliated against, through threats or otherwise that implicated his job, when he orally notified his supervisors and others of changes he was implementing moving forward (and following-up on the company's corrective actions of past occurrences) and being told his decisions were impacting the finances and cash flow of US Med & USMS.  This was compounded when US Med's CEO complained about the pharmacy's September and October numbers insinuating Padron's job was in jeopardy if the numbers did not improve; obviously, numbers cannot improve if there is no inventory to dispense.

62. Padron was also retaliated against when he objected to his involvement and participation in practices that impact US Med's pharmacy license and retail PBM contracts.

63. All of these issues resulted in Padron working in an unsettling, tense, and stressful work environment.

64. Padron was retaliated against by US Med due to his investigation, direct reporting to supervisors and others at US Med, objecting to, and otherwise affirmative action to stop what he believed were irregular, unethical, and illegal / fraudulent practices moving forward including actions that impact pharmacy licensure requirements and retail PBM contracts.

65. Padron was abruptly suspended when he was trying to reconcile an inventory-related issue with diabetic testing strips, especially in light of all of the other issues and practices he uncovered,

---

[7] Such pharmacy was referred to as a burner pharmacy because when US Med or a subsidiary pharmacy would lose a PBM contract (i.e., mail order on a retail contract, acquiring diabetic testing product inventory from unauthorized vendors, not disclosing ownership of a pharmacy), it would simply buy a pharmacy that also had a PBM contract and gradually move patients to that pharmacy so that it could continue to bill and generate revenue from the PBMs. The sentiment was that this pharmacy would ultimately be burned and the practice would repeat itself.

directly reported, followed-up on, and objected to, all of which forced him to work in a very unsettling environment.

66. As soon as Padron was placed on suspension, he sent a letter, through counsel, on December 3, 2017 regarding some of the practices he had orally reported to US's Med's supervisors.  A copy of this letter is attached as **Exhibit "B"**.  Notwithstanding, Padron was ultimately discharged on December 18, 2017.  **(Exhibit "A", ¶22)**

67. Padron, pursuant to Florida Statute §448.103, seeks full reinstatement, compensation for lost wages and benefits, special / compensatory damages such as emotional distress, attorney's fees and costs (per Fla. Stat. §448.104).

Wherefore, Padron seeks all relief and damages available to him under Florida's Whistleblower Act including reinstatement, compensation for lost wages and benefits, special / compensatory damages such as emotional distress, attorney's fees and costs, and all other relief this Court deems just and proper.

### JURY TRIAL DEMAND

A jury trial is demanded on all issues so triable.

Dated this __27__ day of December, 2017.

KIRWIN NORRIS, P.A.

/s David Adelstein
David M. Adelstein
Florida Bar No.: 647314
dma@kirwinnorris.com
Kirwin Norris, P.A.
15 W. Church Street, Suite 301
Orlando, Florida 32801
Phone: 407-740-6600
*Counsel for Marcos Padron*

## DECLARATION OF MARCOS PADRON

Declarant Marcos Padron affirms:

1. My name is Marcos Padron. I am over the age of 18 and have personal knowledge of the facts set forth herein.

2. On April 30, 2015, I was hired as the Director of Pharmacy Operations of US Med, LLC ("US Med"). I was hired in a nonclinical role to handle the call center operations and warehouse and shipping operations (Business Operations). I was hired by US Med's founder and former President / CEO Zachary Schiffman.

3. After I was hired, and after H.I.G. Capital, LLC procured ownership in US Med, Stephen Foreman was hired as the new President/CEO, Mary Ellen Conway was hired as the Chief Compliance Officer, Thomas Barron was hired as the Chief Sales Officer, and Patricio Casillas was hired as the VP of Strategy & Business Development. Patricio Casillas became my direct supervisor.

4. Patricio Casillas also became a direct supervisor of Kimberly Broom, the Director of DME Operations. Kimberly Broom's department handles US Med's and United States Medical Supply, LLC's ("USMS") Durable Medical Equipment ("DME") Medicare billing to Centers for Medicare & Medicaid Services ("CMS"). She is also married to US Med's Chief Financial Officer Clydall Bob. Both Kimberly Broom and Clydall Bob were employed at US Med prior to H.I.G. Capital, LLC's recapitalization of US Med.

5. In or around July 2017, the pharmacist Fernando L. Garcia resigned and Adrienne Michelle Horn was hired to replace him as US Med's licensed pharmacist (and Sr. Clinical Pharmacist in charge of all Clinical Decisions).

6. Adrienne Michelle Horn notified me that something appeared wrong with the manner in which US Med had been dispensing Inhalation Drugs (*e.g.*, Albuterol Sulfate, Ipratropium Bromide, and Albuterol/Ipratropium) in the past. In looking closer and investigating this concern, I learned that Fernando L. Garcia, as the Pharmacist in Charge (Pharmacy Department Manager), had been changing the frequency of patients prescribed Inhalation Drug orders, thereby altering the quantity of an Inhalation Drug dispensed to a patient. For example, if a physician's prescription for an Inhalation Drug called for a frequency of four daily treatments, US Med (Fernando Garcia) was only dispensing three daily treatments. This altered the prescribing physician's prescription (without any identifiable consent from the physician) and short-changed the prescribed quantity of the Inhalation Drug given to a patient. Moreover, I learned that US Med's Medicare billing department to CMS was <u>not</u> revising billings to Medicare, meaning that CMS was being billed for the full value of the prescription (four daily treatments of the Inhalation Drug) when, in reality, only three daily treatments were being dispensed to the patient. This naturally had the effect of an over-billing to CMS for Medicare funds that went back potentially a number of years relating to



1



the manner in which US Med had been dispensing and billing CMS for Medicare funds relating to Inhalation Drugs.

7. Alarmingly, however, I learned much more. I learned that Fernando L. Garcia had not been performing drug utilization reviews (DUR) prior to dispensing the Inhalation Drugs. No reasonable or apparent effort had been made or input into US Med's Abacus database regarding patient medical history including medical conditions, chronic conditions, allergies, or other drugs a patient was currently taking that could interfere with the prescribed Inhalation Drug. This lack of DUR was extremely upsetting because without a DUR, US Med could have been dispensing drugs where a patient could be allergic to the drug, could have a drug-to-drug interaction, or may have a drug-to-existing-medical-condition interaction. Further, not performing any DUR or having any medical records or progress notes from a physician prior to dispensing and billing the Inhalation Drugs to CMS meant that US Med could be dispensing drugs without ensuring the drugs were medically and reasonably necessary to the patient, as CMS requires for Medicare funds.

8. I also learned that Fernando L. Garcia, as the pharmacist, had been dispensing Inhalation Drugs without any patient counseling being offered to the patient. There was no verbal or written offer to counsel a patient regarding the prescribed Inhalation Drug or any record in the Abacus pharmacy database of the patient foregoing the offered counseling and US Med's database did not document any such efforts, whether to the patient or the patient's caregiver, as the case may be.

9. I also learned that USMS, which is not a licensed pharmacy, was using US Med's pharmacy license to dispense the drugs that USMS bills for directly. My direct supervisor is a manager of USMS. USMS has contracts to prescribe drugs to Medicare-approved private health insurance providers through Medicare's Part C Coverage. These plans are also referred to as Medicare Advantage Plans. I learned that USMS is billing the Medicare Advantage Plans for Inhalation Drugs when the Inhalation Drugs were not being dispensed by USMS, but by US Med (since USMS is not a licensed pharmacy).

10. I determined that moving forward no Inhalation Drug prescriptions would be unilaterally altered without the prescribers consent, and no drugs would be dispensed without obtaining a patient's medical records and conducting a DUR and offering patient counseling.

11. I then met with the Pharmacy Supervisor at the time, Cheryl Foye, to inquire about Fernando L. Garcia's changing of Inhalation Drug treatments to patients. I learned in this conversation that the pharmacist apparently had an unwritten rule not to dispense any Inhalation Drug treatments that called for a frequency of four times per day and would short-change such patients by one treatment per day (by only dispensing Inhalation Drugs that would satisfy a frequency of three times per day). I also learned that this was done without obtaining the prescribing physician's consent. I further learned that due to the volume of work required, the pharmacy did not have the resources to call patients or their

2

physicians to get medical records, conduct a DUR, and no patient counseling was being offered. Padron further learned that no efforts were being made to advise US Med's DME Medicare billing department of these salient facts, which would include an over-billing to CMS for Medicare funds where CMS was being billed for four daily prescribed treatments but, in actuality, only three daily prescribed treatments were being dispensed.

12. I immediately went to my supervisor, Patricio Casillas, to report to him what I learned and that I firmly believed these discovered practices or issues to be irregular, unethical, and fraudulent / illegal. I reported to my supervisor that I would not ship out any Inhalation Drugs (or any drugs, for that matter) without corrections moving forward regarding obtaining patient records, conducting DURs, and offering patient counseling. I asked Patricio Casillas whether he wanted to discuss the issue of the previous improper billings to CMS with Kimberly Broom (Director of DME Operations) and Patricio Casillas advised me to speak with her directly.

13. I met with Kimberly Broom to report to her of the practices regarding the improper Medicare billings that I did not know how far back this issue went, and that this billing issue needs to be reported to CMS and rectified with overbillings returned. I also notified Kimberly Broom regarding the lack of DURs and patient counseling under Fernando L. Garcia's pharmacy regime, which posed a health safety risk to patients and whether medically and reasonably necessary drugs were being dispensed.

14. A few days later, I had a follow-up conversation with Patricio Casillas regarding my conversation with Kimberly Broom. Patricio Casillas expressed serious concern with my impact to stop dispensing Inhalation Drugs without performing a DUR or offering patient counseling since that decision has a financial impact on US Med and USMS. For instance, if medical records had to be obtained for patients awaiting an order so that a DUR could be performed, this would result in a billing slow-down and immediate cash flow impact.

15. I then had a discussion with Patricio Casillas and Clydall Bob (Chief Financial Officer) where I again reported the issues and practices. Again, it was discussed that my decision to remedy the situation moving forward under his control posed an immediate cash flow concern due to the billing slow-down. I then stated that upon learning of the practices I believed were irregular, unethical and fraudulent / illegal, I was not going to continue with the same practices, particularly those that can harm a patient or violate licensing requirements, without doing what I could to correct the issues I could correct moving forward.

16. A few days later, I reported the issues and practices directly to Mary Ellen Conway (Chief Compliance Officer) and relayed the aforementioned conversations I had with others at US Med so that the issues could be addressed and self-reported to regulatory agencies.



3

17. A few days later, I then spoke directly with the CEO Stephen Foreman. (I had previously been advised by my supervisor, Patricio Casillas, that Stephen Foreman had been notified of the issues and practices I had reported.) In addition to reporting these issues and practices to Stephen Foreman, I directly advised him that US Med should <u>not</u> be dispensing Inhalation Drugs that USMS is billing when USMS does <u>not</u> have a valid pharmacy license and US Med does not have the contract to dispense those drugs under Medicare's Advantage Plans under Medicare's Part C Coverage. I advised him of my lack of comfort in continuing to do so since my understanding of Medicare billings requires that the DME supplier has to also be a licensed pharmacy and that the billing provider (USMS) has to dispense the drugs. Stephen Foreman, despite my disagreement, responded that since USMS and US Med have the same ownership, it is acceptable for US Med to dispense drugs that USMS is billing for (even though USMS is not a licensed pharmacy). Stephen Foreman further notified me that the past occurrences would be internally investigated and taken care of.

18. From in or around July / August of 2017 through the end of November 2017, and notwithstanding my personal follow-ups, I was not advised of any self-reporting to any regulatory agency of any of the issues I internally reported. This includes self-reporting any of the overbillings to CMS. To this point, I was not even advised of any ongoing internal investigation into these issues.

19. Meanwhile, the discovery of irregular, unethical, and fraudulent / illegal practices created a very tense, uneasy, and stressful environment, specifically for me. I had independently orally reported the issues and practices to my supervisor and others within US Med. I had worked to correct those practices within my control moving forward, despite backlash regarding the immediate financial cash flow impact correcting issues moving forward would create. I was deeply concerned about the well-being of patients that were dispensed drugs by US Med's pharmacy without any DUR or patient counseling and with no understanding as to how US Med and USMS was going to report or remediate past occurrences of this issue. I was nervous that US Med had been improperly billing and over-billing Medicare with no understanding how US Med was going to report or remediate this past occurrence. I was stressed as to potential pharmacy licensure violations, not only in Florida but in other jurisdictions where US Med operates as a nonresident pharmacy. And, US Med's CEO, Stephen Foreman, CFO, Clydall Bob, and my Supervisor Patricio Casillas were putting added pressure on me requiring the pharmacy to improve its financial numbers and that the numbers in September and October were unacceptable, further insinuating that my job would be in jeopardy if the numbers did not drastically improve (and that I was a driving force behind lower numbers due to the corrective measures I was implementing).[1]

---

[1] I had previously advised US Med personnel that my wife had a serious, ongoing medical condition. I needed employment.

4



20. On the evening of November 28, 2017, I was advised by the Pharmacy Operations Manager, Arlene Orenstein, that the pharmacy was out of One Touch Diabetic Strips. Due to issues and practices that I had reported and were being uncovered, and the fact that cash-flow impacts were being directed to me, I became concerned why I was finding out about this issue after working hours. There is a fairly set schedule for US Med's ordering of inventory so not having inventory raises questions, particularly when the pharmacist has discretion to order additional inventory as-needed. The next morning around 8am, I called the pharmacist, Adriene Michelle Horn (who was on her way to jury duty), inquiring why I learned the night before that the pharmacy was out of One Touch Diabetic Strips. She advised me that there was sufficient inventory, raising a very dubious and troubling disconnect between what I had been advised approximately fifteen hours earlier by the Pharmacy Operations Manager. During the call and as I was trying to reconcile the obvious disconnect, the pharmacist hung up the phone. That afternoon I was abruptly placed on paid suspension and I was never advised what the disconnect was regarding inventory levels between the personnel within the pharmacy that deal with the inventory. On December 18, 2017, my paid suspension came to an end and my employment was terminated.

21. Additionally, I objected to the manner in which US Med was operating under rules and regulations associated with pharmacy benefit managers ("PBM"). Particularly, I raised objections to any ongoing participation or involvement in: (i) US Med dispensing mail order diabetic testing strips under PBM contracts when the contracts are retail contracts and I believed this was a violation of the contract; and (ii) US Med, upon losing a certain PBM contract, would purchase a retail pharmacy (that was internally called a burner pharmacy) without disclosing to the PBMs the true, new ownership of that pharmacy. Such pharmacy was referred to as a burner pharmacy because when US Med or a subsidiary pharmacy would lose a PBM contract (i.e., mail order on a retail contract, acquiring diabetic testing product inventory from unauthorized vendors, not disclosing ownership of a pharmacy), it would simply buy a pharmacy that also had a PBM contract and gradually move patients to that pharmacy so that it could continue to bill and generate revenue from the PBMs. The sentiment was that this pharmacy would ultimately be burned and the practice would repeat itself.

22. As soon as I was placed on suspension, I sent a letter, through counsel, on December 3, 2017 regarding some of the practices I had orally reported to US's Med's supervisors. A copy of this letter is attached as Exhibit "B" to the Complaint. Notwithstanding, I was ultimately discharged on December 18, 2017.

Under penalties of perjury and per Florida Statute §95.525, I declare that I have read the foregoing and that the facts stated in it are true to the best of my knowledge.

5

Signature, Marcos Padron

12/26/2017

Date

6

EXHIBIT B



KIRWIN NORRIS, P.A.
15 W. Church Street, Ste. 301
Orlando, FL 32801
Telephone: 407.740.6600

DAVID M. ADELSTEIN
DIRECT LINE: 954.295.6117
EMAIL: dma@kirwinnorris.com

December 3, 2017

**Via Email (sforeman@usmed.com)**
Stephen Foreman, Managing Member
US Med, LLC
8260 NW 27th Street, Suite 401
Doral, FL 333122

Re:   Retaliatory and Adverse Employment Action Taken Against
Employee Marcos Padron

I represent US Med, LLC's ("US Med") employee, Marcos Padron ("Padron"), in connection with a wholly or partially motivated adverse and retaliatory employment action taken by US Med as the result of his verbal reporting and objections to US Med's business practices that he construed as unethical, irregular, and/or illegal.  Previously, Padron notified you and other officers at US Med of these practices along with his objections to US Med continuing with, and not correcting, these practices.   Padron is reiterating these practices in writing, his objections to these practices, and his desire for US Med to reasonably correct such practices, since they form a basis of US Med's retaliatory and adverse employment action discussed herein.

### I.   Padron's Reporting of Unethical, Irregular, and/or Illegal Practices

US Med is an authorized Part B Medicare supplier of durable medical equipment and gets reimbursed by Medicare (commercial insurance and managed care plans) for dispensing diabetic testing strips, respiratory equipment and supplies, orthotics, catheters and, applicable here, inhalation drugs (*e.g.*, Albuterol Sulfate, Ipratropium Bromide, and Duoneb) ("Inhalation Drugs").   US Med, in its capacity in dispensing such drugs, needs to maintain an active pharmacy license, meaning it needs to be licensed as a pharmacy and must have a licensed pharmacist that enables US Med to dispense drugs.

US Med, in its role as a mail-order pharmacy, would need to be licensed through Florida's Board of Pharmacy and other states' Boards of Pharmacies, or regulating agencies where it is dispensing drugs through the mail.

US Med, in its role as a supplier of durable medical equipment, would bill Medicare for the prescribed drugs and, in its role as a licensed pharmacy, would dispense those drugs pursuant to a prescription.

In or around July 2017, Padron alarmingly learned that US Med had been engaging in certain improprieties that he perceived to be unethical, irregular and/or illegal.   Specifically, he learned:

EXHIBIT
B

1) US Med, through its prior licensed pharmacist, was short-changing prescriptions for Inhalation Drugs.  For instance, if a prescription to a patient for an Inhalation Drug called for a frequency of four daily treatments, US Med was only dispensing three daily treatments, altering the original physician's prescription without first contacting the physician for approval and, short-changing the prescribed quantity of the Inhalation Drugs given to the patient.  However, US Med was <u>not</u> changing the quantity in its billings to Medicare.   Stated differently, Padron learned that US Med was billing Medicare as a durable medical equipment supplier for the prescribed Inhalation Drug treatments despite dispensing a <u>lesser quantity</u> of prescribed Inhalation Drug treatments through its pharmacy to the patient.  US Med was also billing Medicare without having the doctor's medical records (progress notes) to corroborate the patient's medical necessity.

2) US Med was not screening, performing drug utilization review ("DUR") prior to dispensing drugs such as the Inhalation Drugs.  No effort was made to collect or include any medical history from the patient in US Med's drug prescription filling and dispensing.  Such medical history would include patient allergies, medical conditions including chronic conditions, or other drugs a patient was taking that could interfere or interact with the prescribed drug.  This lack of DUR was immediately distressing because US Med could be dispensing drugs where a patient (i) may be allergic (such as a drug with Sulfate knowing there are people allergic to Sulfa), (ii) may have a drug-to-drug interaction, or (iii) may have a drug-to-existing medical condition interaction.

3) US Med, on certain occasions, was filling and dispensing drugs based on expired prescriptions.  And,

4) US Med was dispensing drugs without any patient counseling.  No verbal or printed offer to counsel a patient was provided in writing or otherwise.  There was nothing in US Med's pharmacy system that documents any such counseling efforts by the pharmacist to patients or their caregivers.

As you are aware, Padron met with you (and others at US Med) and notified and reported to you these business practices, that he perceived these practices to be illegal, irregular, and unethical, and that he did not want to continue engaging in these practices (and that he otherwise wanted these business practices reasonably corrected). Without any DUR or patient counseling there was not a viable way for US Med to safely monitor drugs dispensed to a patient.  Padron has been involved in correcting certain practices within his reasonable control moving forward.  However, Padron is unaware of any efforts US Med has implemented to rectify incorrect Medicare billings (and he does not know how far back this goes), contact prescribers or inform regulatory agencies to make them aware of the lack of DURs, or otherwise check on patients that it dispensed drugs to without collecting any medical history or not providing any patient counseling.  In addition, the reason this is important is to ensure an adverse event has not occurred and will not occur to a patient.  US Med has not shared any corrective action plan with Padron despite Padron meeting with you and others regarding his immediate concerns about these practices and, of course, any corrective action.

## II. Padron's FMLA Claim at the Direction of US Med

In or around early November 2017, Padron notified US Med's Human Resources ("HR") department, via a physician's letter, for his need for accommodations due to radiating arm and back pain that was preventing him from sitting at his desk for long durations. The purpose of his notification was to advise HR of this fact and that he would be seeking medical opinions regarding his condition and the accommodations sought. Padron did not know whether he would even need to use any paid time off to accommodate the doctor's appointments. Nonetheless, HR advised Padron that he needed to fill-out and furnish HR with a Certification of Health Care provider for Employee's Serious Health Condition – a US Department of Labor Form dealing with the Family and Medical Leave Act ("FMLA").

Padron filled out this form on November 6, 2017 and submitted the required paperwork from his physician to HR. HR, for reasons unbeknownst to Padron, denied his request on November 15, 2017 claiming his physician did not properly fill out the paperwork. Keep in mind that the submission of the form supported by a physician was at the behest of HR.

Padron re-submitted the paperwork along with medical notes on November 22, 2017 to HR. Once more, for reasons unbeknownst to Padron, HR orally denied this request. Padron again explained to HR that he is in the process of scheduling an MRI scan, other doctor's appointments, and physical therapy pending the MRI results, and may need to miss work for these appointments. No response has been provided to Padron's re-submitted request other than HR's oral denial.

## III. Adverse and Retaliatory Employment Action

On November 28, 2017, Padron was advised by US Med's Pharmacy Operations Manager after 5pm that US Med was out of One Touch Diabetic Testing Strips. Not having inventory is a big deal because the pharmacy cannot dispense orders without inventory and this would impact month end numbers. During prior meetings, you advised Padron and others that the pharmacy's September and October month-end numbers were unacceptable and that the pharmacy needed to drastically improve its numbers or else there would be potential downsizing in the pharmacy, i.e., insinuating that Padron's employment was directly in jeopardy if the pharmacy's numbers did not improve. And, as you are aware, the numbers cannot improve without the appropriate inventory.

Although there is a schedule for ordering supplies (inventory), the Pharmacy Operations Manager and Pharmacy Department Manager (licensed pharmacist) have discretion to order additional supplies as-needed so that the pharmacy has the inventory to dispense orders. Accordingly, Padron called the Pharmacy Department Manager on November 29, 2017 around 8am, even though she was on her way to jury duty, inquiring how US Med could run out of inventory to dispense diabetic testing strips. The Pharmacy Department Manager responded that there was inventory contradicting what Padron was advised the night earlier by the Pharmacy Operations Manager. During the call Padron was trying to reconcile the disconnect between what both the Pharmacy Department Manager and Pharmacy Operations Manager were telling him regarding inventory levels. The Pharmacy

Department Manager elected to end the call and that afternoon after 5pm Padron was notified that he was being sent home and placed on paid suspension. Padron still does not know what prompted the disconnect regarding inventory levels between the Pharmacy Operations Manager and Pharmacy Department Manager and he was abruptly suspended before he could dig into the details regarding this issue.  Prior to this suspension, Padron had never been advised of any issue or concern with his employment other than the insinuation that his job was in jeopardy if the pharmacy did not drastically improve its numbers.

To date, Padron has not been asked to answer any questions regarding the issues that prompted the post-5pm suspension, provide any information, and he has not received any clarification regarding the disconnect in inventory levels.

At this point, Padron believes the suspension is wholly or partially motivated by his reporting, objections, and follow-ups to unethical, irregular, and illegal business practices and overt efforts he has taken for US Med to correct such practices moving forward. Clearly, US Med is not interested in correcting or self-reporting any violations associated with its business practices since it presumably could result in potential repercussions with Medicare, as well as potential issues with its pharmacy licenses based on the manner in which it has dispensed drugs. Perhaps this is also the result of Padron notifying US Med that he would need certain accommodations and would like to use certain time off, as needed, to deal with doctor's appointments and therapy supported by the physician's records that US Med asked him to furnish.    Either way, the suspension of Padron's employment is unnerving.

### IV. Evidence Preservation

You are hereby notified to preserve, and not destroy, spoil, or alter, all records you maintain, whether stored electronically or digitally on your Abacus database or otherwise, relating to the issues in this letter.  This includes all records relating to Medicare billing and payments, prescriptions received, prescriptions dispensed, DURs, patient counseling, inventory ordering, inventory levels, Medicare audits, internal protocols and quality control standards applicable to receiving prescriptions and dispensing drugs, and any records relating to reporting to Boards of Pharmacy and Medicare the issues reported by Padron.

Additionally, you are notified to preserve, and not destroy, spoil, or alter, all records you maintain, whether stored electronically or digitally on your Abacus database or otherwise, any FMLA requests received from other employees, the granting of such requests, the ability to allow employees to use accrued paid time off, company policies relating to the same, and any records, notes, or memos relating to HR's request to Padron to submit FMLA paperwork to use accrued paid time off for certain doctor appointments and therapy.

### V.  Request for Meeting

Padron has been asked to report back to work on Tuesday, December 5, 2017 following his paid suspension to discuss the basis of the suspension. However, in light of the severity of the issues and concerns raised in this letter, Padron requests a meeting during the week of December 11th with counsel present to immediately resolve the issues set forth in this letter and follow-up on his reporting of irregularities to you, and particularly any

reasonable corrective action plan moving forward.  Please direct all communications to me regarding the contents of this letter or Padron's request for a meeting with counsel.

Yours truly,

David Adelstein

cc:     Clydall Bob, CFO (cbobb@usmed.com)
        Mary Ellen Conway, CCO (MEconway@usmed.com)
        Patricio Casillas, VP of Strategy (pcasillas@usmed.com)
        Craig Greenfield, Esq. (cgreenfield@usmed.com)